UNITED STATES  DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DAMON FLOYD WILLIAMS, | CIVIL ACTION |
| **Plaintiff** | |
| VERSUS | NO. 11-160 |
| GREG CHAMPAGNE, et al. | SECTION "E" |
| **Defendants** | |

### ORDER & REASONS

The Court has pending before it Defendants' motion for summary judgment and Plaintiff's opposition.[1] The Court has reviewed the motions, the exhibits, and the applicable law, and now enters this Order and Reasons.

### BACKGROUND

Plaintiff Damon Floyd Williams was incarcerated from 2007 to 2011 at Nelson Coleman Correctional Center in Saint Charles Parish, Louisiana.  This case arises out of (1) a grooming policy which he contends substantially burdened his religious practices, and (2) a specific incident in which he contends he was subjected to unconstitutional excessive force.

Williams practices the Rastafarian religion, one tenet of which is that men should grow their hair long in dreadlocks.  *See Harris v. Chapman*, 97 F.3d 499, 502 (11th Cir. 1996).  During his detention at Nelson Coleman, Williams had shoulder-length dreadlocks. The Nelson Coleman Inmate Handbook prohibited dreadlocks and required men's hair to be no more than two inches long:

---

[1]R. Docs. 82, 84.

> Inmates are not permitted to wear extensions, braids, plaints [sic], weaves, wigs, dreadlocks, toupees, emblems/designs or any hair styles that are not standard or the norm to prevent the concealment of contraband and ensure the hygiene, sanitation, and personal safety for staff and inmate's [sic]. ...
>
> Inmate's [sic] hair styles are restricted to standard types ... [and] [a]ll inmates head hair will be cut to a length of two (2) inches from the skull in a neatly tapered conforming shape. ... All female inmates head hair will be cut to a length not to exceed below the shoulder.

R. Doc. 84-4 at 7-8 ("the Hair Policy"). Williams was not forced to cut his hair or remove his dreadlocks pursuant to this policy. He was, however, confined to 23-hour-a-day lockdown. Williams asserts that he was "told that Rastafarianism is not a religion" and that he could not leave lockdown until he cut his hair.[2]

Williams' excessive force claims arise out of the events of November 18, 2010. According to Williams, as he left the shower to return to his cell Deputy Cornwell confronted him about not wearing a shirt and "braced [him] up." After returning to his cell, Williams states that Deputy Cornwell said to him, over an intercom, that Cornwell "wished [Williams] had made a wrong move." Williams then used the intercom to ask to speak to Cornwell's supervisor.[3]

At this point, Williams contends that Cornwell sought and received authorization to have Williams confined in a restraint chair known as the "suicide chair."[4] At any rate,

---

[2]R. Doc. 84-2 at 2.

[3]*Id.* at 2-3.

[4]Cornwell stated in his deposition that he did not request the suicide chair but only spoke to a supervisor about Williams' purported abuse of the intercom system. Williams cites a policy document stating that "instruments of restraint are never used as punishment but only used as a precautionary security control measure of last resort ... as authorized by the Shift Manager as a prevention against inmate self-injury, injury to others, or property damage." (R. Doc. 84-12 at 1). It is apparently undisputed on this record that, prior to his cell extraction, Williams had not threatened injury to himself, to others, or to property.

Deputy Cornwell and Deputy Acevedo extracted Williams from his cell. Williams contends, and neither Cornwell or Acevedo disputes, that Williams complied during the cell extraction.[5]

The factual accounts diverge after that. According to Williams, once extracted from the cell Deputies Cornwell and Acevedo pushed him and ripped out some of his dreadlocks. Then, in a hallway on the way to the restraint chair, Williams claims that his head was slammed into a wall and more dreadlocks were ripped out. Finally, once Williams was placed in the restraint chair, he asserts that (1) the handcuffs were so tight as to cause pain, (2) Deputy Acevedo pulled on the handcuffs to cause more pain, (3) in response he spit at Deputy Acevedo, and (4) Deputy Acevedo then punched him in the head.[6] Williams presents testimony and photographic evidence of his injuries following these events, including a wound on his head where he contends dreadlocks were torn out, and "cuts, bruises, and swelling on both wrists."[7]

According to Defendants, after leaving his cell (1) Williams was verbally abusive, (2) said "I'm gonna get me a lawsuit" and then attempted to jump off the top of a set of stairs, (3) lost a dreadlock to an officer trying to keep him from jumping, and (4) ran his own head into walls.[8] Acevedo concedes that he punched Williams in the head after Williams spit at

---

[5]R. Doc. 84-2 at 3; R. Doc. 84-9 at 11 (43:13-22).

[6]R. Doc. 84-2 at 3; R. Doc. 84-3 at 9 (31:4-18).

[7]R. Doc. 84-2 at 4, 6-26.

[8]R. Doc. 82-7 at 8-9 (Acevedo deposition); 20-21 (Cornwell deposition); 36-37 (Levet deposition)

him.[9]

Williams pursued the appropriate administrative remedies and then filed this lawsuit, alleging various federal constitutional claims pursuant to § 1983 claims as well state-law tort claims. He named as Defendants St. Charles Parish Sheriff Greg Champagne, Warden Roland LaDreyt, Assistant Warden Alvin Robertson, and Deputies Daniel Levet, Jorge Acevedo, and John Cornwell.

## STANDARD OF LAW

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991). If the moving party fails to carry this burden, the motion must be denied. If the moving party successfully carries this burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists. *Id.* at 322-23. Once the burden has shifted, the non-moving party must direct the Court's attention to something in the pleadings or other evidence in the record that sets forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist. *Id.* at 324.

If the dispositive issue is one on which the non-moving party will bear the burden

---

[9]*Id.* at 10.

of proof at trial, however, the moving party may satisfy its burden by simply pointing out that the evidence in the record is insufficient with respect to an essential element of the non-moving party's claim.  *See Celotex*, 477 U.S. at 325.  The nonmoving party must then respond, either by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party" or by coming forward with additional evidence.  *Celotex*, 477 U.S. at 332-33 & 333 n.3.

"An issue is material if its resolution could affect the outcome of the action." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).  When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 150-51 (2000).  All reasonable inferences are drawn in favor of the non-moving party.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party, thus entitling the moving party to judgment as a matter of law.  *Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir. 2002).

## ANALYSIS

In his amended complaint, Williams asserted fifteen counts against six Defendants in their official and individual capacities.  Discovery and the motion for summary judgment have narrowed the issues somewhat.  First, Williams agrees all claims against Defendants Robinson and Levet should be dismissed.  Second, Williams expressly abandons Counts 2, 5, 7, 10, and 13.  Third, the Court notes that not every legal theory was expressly briefed by

the parties; Defendants did not move for summary judgment with respect to Count 8, and neither side has presented meaningful analysis regarding the substance of Counts 3, 9, 14, or 15.  Accordingly, the Court will focus on the claims actually briefed: (1) Count 1, the First Amendment/free exercise challenge to the Hair Policy, (2) Count 8, the Equal Protection claim, (3) Counts 4 and 6, the excessive force and unreasonable seizure claims, (4) Counts 11 and 12, the state-law assault and battery claims, and (5) whether Plaintiff can pursue any claims against Sheriff Champagne or Warden Ladreyt in either their individual or official capacities.

## A.     Count 1: the Hair Policy

Plaintiff contends that the Nelson Coleman Hair Policy substantially burdened exercise of his religion.  The Court will assess this claim under the rubric of the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  42 U.S.C. § 2000cc-1(a).[10]  In *Garner v. Kennedy*, 713 F.3d 237, 241-42 (5th Cir. 2013), the Fifth Circuit explained the RLUIPA analysis:

> RLUIPA provides that no "no government shall impose a substantial burden on the religious exercise of a person confined in an institution, even if that burden results from a rule of general applicability," unless that burden "is in furtherance of a compelling government interest" and "is the least restrictive means of furthering that compelling government interest."  The plaintiff initially bears the burden of showing that "the challenged government action substantially burdens the plaintiff's religious exercise."  In order to show a substantial burden, the plaintiff must show that the

---

[10]Plaintiff alleged facts supporting a claim under RLUIPA in the amended complaint (which was filed before present counsel enrolled), although he did not expressly invoke that statute in any filings until the opposition to summary judgment.  Nonetheless, the Court will assess his claim under RLUIPA because Defendants are in no way prejudiced, having agreed in their motion that "[t]he new test for religious exercise cases is that of a compelling necessity/least restrictive means," which is essentially the standard under RLUIPA. R. Doc. 82-1 at 7.

challenged action "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs.

      If the plaintiff shows that the government action imposes a substantial burden on his religious exercise, the burden then shifts to the government to show that the action was supported by a compelling interest and is the least restrictive means of furthering that compelling interest. However, the Supreme Court has held that although RLUIPA requires a compelling interest, "context matters," and therefore the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."

*Id.* at 241-42 (citations omitted).

      Defendants do not dispute or even address whether the Hair Policy (and putting Williams in lockdown for refusing to cut his hair) imposes a substantial burden on his religious exercise, so the Court will assume that it does. Therefore, the burden shifts to Defendants to articulate how the policy (1) is the least restrictive means of (2) furthering a compelling government interest. This is essentially strict scrutiny review of the Hair Policy. *See Sossamon v. Lone Star St. of Tex.*, 560 F.3d 316, 335 (5th Cir. 2009).

      Defendants propose safety and hygiene as the compelling government interests justifying the Hair Policy. Certainly, safety and hygiene of inmates are compelling government interests that can justify some prison policies, but the Fifth Circuit requires more than "bare assertions" that a specific policy furthers that compelling interest. *See Moussazadeh v. Tex. Dep't of Crim. Justice*, 703 F.3d 781, 794 (5th Cir. 2013). For example, in *Moussazadeh*, the defendant institution attempted to justify its failure to provide a kosher meal option at the plaintiff's place of incarceration on security grounds, but "failed to produce evidence of security concerns related to providing kosher food." *See id.* Here, Defendants assert that dreadlocks can conceal weapons or contraband or harbor

lice.[11] But Plaintiffs respond that Sheriff Champagne could not remember a single incident involving contraband hidden in hair,[12] and the record is devoid of evidence regarding lice.

But even if Defendants have raised a fact question that the Hair Policy furthers the compelling government interests in safety and hygiene of inmates, they have failed to meet their burden to show that the Hair Policy is the least restrictive means of doing so. Defendants cite the correct legal standard but offer no analysis or relevant evidence. Instead, they merely reproduce  deposition testimony suggesting, at most, that the Hair Policy is *one way* of addressing safety and hygiene concerns–not that it is the least restrictive means required by RLUIPA.[13] And in opposition, Williams offers plausible, less-restrictive alternatives, such as (1) requiring that dreadlocks be washed and subject to metal detectors, (2) permitting dreadlocks at a length short enough preclude concealment of weapons, or (3) permitting religious exemptions for Rastafarian practitioners.[14] Defendants did not file a reply to address those suggested alternatives.  On this record, Defendants have not met their burden to show no factual dispute that the Hair Policy furthers a compelling government interest in the least restrictive way possible.  Accordingly, the motion for summary judgment is denied as to Count 1.[15]

## B.   Excessive Force: Counts 4 and 6

---

[11]R. Doc. 82-1 at 8.

[12]R. Doc. 84-8 at 52.

[13]R. Doc. 82-1 at 7-13.

[14]R. Doc. 84 at 12.

[15]Williams is no longer incarcerated in Nelson Coleman.  Because Defendants do not mention this fact or base any argument on it, the Court express no opinion as to any legal effect it might have.

Defendants assert qualified immunity to Plaintiff's excessive force claims.  "To determine whether a defendant is entitled to qualified immunity, this court engages in a two-pronged analysis, inquiring (1) whether the plaintiff has alleged a violation of a constitutional right and, if so, (2) whether the defendant's behavior was objectively reasonable under clearly established law at the time the conduct occurred."  *Hampton v. Oktibbeha Cty. Sheriff Dep't*, 480 F.3d 358, 363 (5th Cir. 2007).  The burden is on Williams to rebut the defense, once asserted.  *Id.*

### 1) Violation of a Clearly Established Constitutional Right

Williams asserts violation of his Eighth Amendment right to be free of cruel and unusual punishment in the form of excessive force.  He must show a genuine dispute of material fact that he suffered "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable."  *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).

In their motion for summary judgment, Defendants rely on outdated cases which required a "significant injury" to state an Eighth Amendment excessive force claim.  This is no longer the law.  Rather, the Court must "decide excessive force claims based on the nature of the force rather than the extent of the injury."  *Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010).  The "'core judicial inquiry'" is "not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  *Id.* at 37 (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see also id.* at 38 ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.").

Williams asserts three instances of excessive force. Because the summary judgment record is different as to each incident, the Court will address them separately. Two of the instances are recorded on surveillance video. The Court is not required to adopt Williams' version of the facts for the purposes of ruling on summary judgment if his version is "blatantly contradicted by the record, so that no reasonable jury could believe it." *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that courts should "view[] the facts in the light depicted by the videotape").

### a) Outside His Cell

First, Williams asserts that after he complied with orders to leave his cell, Deputies Acevedo and Cornwell "pushed [him] and grabbed [his] hair," resulting in "five or six" dreadlocks being pulled out of his head. This was not recorded on any surveillance video in the summary judgment record. Williams submits competent photographic evidence and testimony consistent with having had dreadlocks ripped from his scalp.

Defendants dispute these facts, but, construed in Williams' favor, they can support a jury finding of an Eighth Amendment violation. If the jury believes Williams' testimony, then there was no basis for Acevedo or Cornwell to use any force at all to maintain discipline, let alone force sufficient to rip a dreadlock from his scalp. Thus, on this version of the facts the force used was objectively unreasonable. Williams has raised a fact question as to this Eighth Amendment violation.

### b) The Hallway

Second, Williams asserts that in a hallway on the way to the "suicide chair" cell, "[his] head was rammed into a wall, and Deputy Cornwell pulled [him] by the chain

connecting [his] handcuffs."[16]  Deputies Cornwell and Acevedo, on the other hand, state that Williams was "acting up," that he attempted to run his own head into walls, and that they were forced them to carry him to the "suicide chair" cell.  Surveillance video of the hallway shows Williams struggling as he is escorted forcibly by six deputies.  In the course of those struggles, his head does appear to hit a wall, and the deputies appear to pick him up and carry him.[17]

Having viewed the video, the Court concludes that Williams' account of the hallway incident is not credible.  *See Scott*, 550 U.S. at 380.  The video unambiguously shows Williams resisting multiple deputies as he is escorted down the hallway.  In light of that video, no reasonable jury could conclude that the force applied was *clearly* excessive to the need, rather than simply "applied in a good-faith effort to maintain or restore discipline." Therefore, there is no triable fact question as to whether the incident in the hallway violated Williams' Eighth Amendment right.  Summary judgment is granted insofar as Counts 4 and 6 are predicated on the hallway incident.

### c) In the "Suicide Chair"

Third, Williams asserts that while he was fully restrained in the "suicide chair," Deputy Acevedo "pulled on [his] handcuffs, making [him] cry out in pain and making them even tighter," and then, after Williams spit at him in response to the pain,"Acevedo punched [him] in the head."[18]  Acevedo readily concedes that he punched Williams in the head.  Competent summary judgment evidence suggests that deputies are not supposed to

---

[16]R. Doc. 84-2 at 3;

[17]P. Ex. M (manual attachment).

[18]R. Doc. 84-2 at 3;

11

pull on the chain connecting handcuffs because it can injure an inmate.[19]  Surveillance recording of this incident, viewed reasonably in Williams' favor, shows Williams writhing in pain and then spitting, and Acevedo striking Williams forcefully in the head.[20]  Williams did have "cuts, bruises, and swellings" on his wrists after these events.[21]

Construing the facts and video in Williams' favor, Williams has raised a triable fact question as to an Eighth Amendment excessive force claim based on this conduct as well. He was fully restrained in the "suicide chair."  The video is consistent with Williams being in great pain from tight handcuffs, and with Acevedo pulling on the handcuffs to inflict more pain.[22]  Although Williams concedes that he spit at Acevedo, a reasonable jury could find that Acevedo's strike to the head of a completely restrained man was excessive, and such conduct (if believed by the jury) is objectively unreasonable.

### 2) Objective Reasonableness

The next step of the qualified immunity analysis requires the Court to consider whether the two triable incidents of excessive force (the alleged hair-pulling outside his cell and the "suicide chair") were objectively reasonable in light of clearly established law at the time of the incidents.   "Even though an officer's use of force must be objectively unreasonable to violate constitutional rights, a defendant's violation of constitutional rights can still be objectively reasonable if the contours of the constitutional right at issue are

---

[19]R. Doc. 84-9 at 44:15-19 (Acevedo deposition).

[20]P. Ex. N, manual attachment.

[21]R. Doc. 84-2 at 4, and attached pictures.

[22]Whether he was instead checking circulation and not applying malicious force is a question for the jury.

sufficiently unclear." *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008).   "The central concept is that of 'fair warning': The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* at 501-502 (citations and internal quotation marks omitted).   In assessing the reasonableness of the challenged conduct, the Court  must consider context and the "tense, uncertain, and rapidly evolving circumstances."  *Id.* at 502 (internal quotation marks omitted).   At the time of these incidents, it was clearly established that a law enforcement officer cannot "forcefully slam [an arrestee's] face into a vehicle while she was restrained and subdued." *Bush*, 513 F.3d at 502.[23]

The dreadlock-ripping incident and the "suicide chair" incident, construed in the light most favorable to Williams, were objectively unreasonable in light of clearly established law.  Generally and specifically, the "contours" of the Eighth Amendment were sufficiently developed to give Deputies Acevedo and Cornwell fair notice that they could not rip a dreadlock from the head of a compliant inmate.  Likewise, the Court concludes that the law was sufficiently developed to give Acevedo fair notice that he could not pull handcuffs that were too tight to inflict pain on a completely restrained inmate, and then punch that inmate in the head if the inmate spit at him in response to the infliction of pain.

Accordingly, the Court finds that neither Deputy Cornwell nor Deputy Acevedo are entitled to qualified immunity against Williams' claim that they violated his Eighth

---

[23]"[A] claim of excessive force by a law enforcement officer is analyzed under the same standard regardless of whether it arises under the Fourth Amendment or the Eighth Amendment." *Payne v. Parnell*, 246 F. App'x 884, 889 n.4 (5th Cir. 2007).

Amendment right to be free from excessive force with respect to (1) the dreadlock-ripping allegation outside of Williams' cell, and (2) the "suicide chair" incident. Summary judgment as to Counts 4 and 6 is denied with respect to those incidents but granted with respect to the hallway incident.

### C.   Counts 11 and 12: State-Law Assault & Battery

Defendants also move to dismiss Counts 11 and 12, which assert claims of assault and battery under Louisiana law against Acevedo and Cornwell. Because the Court has not dismissed Williams' federal claims, Defendants' primary argument that the state-law claims should be dismissed for lack of jurisdiction fails at the outset. Their remaining arguments are cursory and unpersuasive. State-law tort claims against law enforcement officers "are analyzed under general negligence laws, which employ a duty-risk analysis." *Manis v. Zemlik*, 96 So. 3d 509, 513 (La. Ct. App. 5th Cir. 2012). The same factual disputes which preclude summary judgment on the Eighth Amendment § 1983 claims preclude summary judgment on the state-law tort claims.

Defendants also assert immunity under Louisiana Revised Statute § 9:2798.1, which is "essentially the same as the discretionary function immunity provided within the Federal Tort Claims Act" and "protects only governmental actions and decisions based on considerations of public policy." *Commerce & Ind. Ins. Co. v. Grinnell Corp.*, 280 F.3d 566, 571-72 (5th Cir. 2002) (internal quotation marks and emphasis omitted). By its plain terms, the statute does not apply to "criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct." La. Rev. Stat. § 9:2798.1(C)(2). Defendants have not sufficiently articulated how that statute is a barrier to the assault and battery claims. Accordingly, summary judgment is denied as to Counts 11 and 12.

14

**D.     Summary Judgment as to Sheriff Champagne and Warden Ladreyt**

Finally, Defendants Champagne and Ladreyt contend that summary judgment should be granted as to them with respect to all claims.  Both are sued in their individual and official capacities with respect to all counts.[24]  The briefing as to Champagne and Ladreyt is lacking, and to a certain extent the parties may be talking past one another.

"Officials acting in a supervisory role may only be held liable under § 1983 if they either (1) affirmatively participate in acts that cause a constitutional deprivation or (2) implement unconstitutional policies that causally result in the plaintiff's injury." *Thompson v. Johnson*, 348 F. App'x 919, 921 (5th Cir. 2009).  Champagne and Ladreyt did not affirmatively participate in any acts alleged in this case, and Williams does not attribute the incidents of excessive force to any unconstitutional policy.  Therefore, they contend that they cannot be liable for the acts of their subordinates either under a theory of *respondeat superior* or failure to train or supervise and should be dismissed from the case.[25]

In opposition to summary judgment Williams asserts only that "Champagne and Ladreyt should remain in this suit, because of their involvement in instituting and enforcing the unconstitutional hair cutting policy."[26]  Williams cites *Piotrowski v. City of Houston*, a case addressing § 1983 municipal liability under the Supreme Court's *Monell* decision.  *See* 237 F.3d 567, 578 (5th Cir. 2001).  Thus, as best the Court can determine, Williams wishes to maintain a claim against Champagne and Ladreyt in their official capacities, which is functionally a claim against St. Charles Parish.  *See, e.g.*, *Thomas v. City of*

---

[24]R. Doc. 42.

[25]R. Doc. 82-1 at 29.

[26]R. Doc. 84 at 21.

15

*Houston*, 537 F. App'x 593, 595 (5th Cir. 2013).  Because of the gaps in the briefing, because summary judgment as to Count 1 as to the Hair Policy is not warranted at this time, and because Champagne and Ladreyt both appear to be policymakers behind the Hair Policy, the Court will not dismiss them in their official capacity as to Count 1.  However, summary judgment is granted as to Champagne and Ladreyt with respect to all other Counts, and as to Count 1 as to their individual capacities.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** with respect to:

• All claims against Defendants Levet and Robertson;

• Counts 2, 5, 7, 10, and 13, which Williams expressly abandoned;

• Counts 4 and 6 (excessive force), to the extent they are predicated on the hallway incident;

• All claims against Defendants Champagne and Ladreyt in their individual capacities, and Counts 4, 6, 11, and 12 against Defendants Champagne and Ladreyt in their official capacities.

The motion is **DENIED** as to the following, which will be the issues for trial (unless the parties further narrow or clarify the remaining issues in the proposed pretrial order):

• Count 1 (the challenge to the Hair Policy) against Defendants Champagne and Ladreyt in their official capacities, and Defendants Acevedo and Cornwell;

• Counts 4 and 6 (the excessive force claims) against Defendants Acevedo and Cornwell, based on (1) the dreadlock-ripping allegation outside of Williams' cell, and (2) the "suicide chair" incident;

- Counts 11 and 12 (the state-law assault and battery claims) as to Acevedo and Cornwell; and

- Count 3 (Fourth Amendment seizure), Count 8 (Equal Protection), Count 9 (due process), Count 14 (negligent infliction of emotional distress, and Count 15 (false imprisonment), (except as to Defendants Levet and Robertson, and Defendants Champagne and Ladreyt in their individual capacities), because those claims were not adequately briefed in Defendants' motion for summary judgment.

New Orleans, Louisiana, this 6th day of April, 2014.

_____
SUSIE MORGAN
UNITED STATES DISTRICT JUDGE